STATE OF IOWA, Plaintiff, v. GORDON DAVIS, Defendant, Appellant.

**Criminal law:** ASSAULT AND BATTERY:   CORPOREAL PUNISHMENT:   EVIDENCE.   On this prosecution of a school teacher for the corporeal

punishment of a pupil, the evidence is held to require submission of the question of whether the punishment was immoderate and unwarranted, and to support a finding of assault and battery.

**Same:**  CONFLICTING INSTRUCTIONS. Instructions in assault and battery
2   dealing with the supposed state of facts as contended for by the state, and directing a verdict for plaintiff if such facts are found to be true; and another instruction dealing with the facts as contended for by defendant, with direction to return a verdict for him if found to be true, no complaint being made as to the correctness of either, were not contradictory in the sense that they were prejudicial to defendant.

**Same:**  CORPORAL PUNISHMENT:   INSTRUCTIONS.   An instruction requiring
3   the jury to find whether the degree of impudence and defiance of a pupil was the violation of a reasonable rule of discipline in the school, was not objectionable as requiring a finding as to what was a reasonable regulation, and whether it was reasonable to forbid saucy and impudent conduct.

**Same:**  EVIDENCE OF CUSTOM:   INSTRUCTION.   Where the defendant
4   upon the trial of the action denied that he punished a pupil for refusal to perform a certain act, but based the punishment solely upon saucy and impudent conduct in refusing to so perform, exclusion of evidence that it had been the custom to require performance of the act of the older children was not prejudicial. And the ruling excluding the evidence was not rendered erroneous by the subsequent instruction that if defendant as a reasonable man believed that he had the right to require performance of the act, and in that belief inflicted the punishment because of the refusal, he would be guilty of assault and battery; as the instruction was more favorable to defendant than he was entitled to.

*Appeal from Davis District Court.*—HON. F. M. HUNTER, Judge.

FRIDAY, FEBRUARY 21, 1913.

THIS is a prosecution, upon information, for assault and battery. It was heard in the district court on appeal from a justice court. From a verdict and judgment of conviction in this district court, the defendant has appealed.—*Affirmed.*

*T. P. Bence* and *E. Rominger,* for appellant.

*George Cosson,* Attorney-General, for the State.

EVANS, J.—The defendant is a school-teacher. On October 24, 1910, he was engaged in teaching the public school of Pella district, in Davis county. One of his pupils was May Downing, a girl of about fourteen years of age. The defendant inflicted corporal punishment on her for alleged misconduct. Such corporal punishment is the basis of the charge of assault and battery.

I. At the close of the evidence for the state, the defendant moved for a directed verdict on the general ground of failure of proof.

There was no drinking water to be had from the schoolhouse well. It appeared to have been the habit of the defendant to request or require the larger scholars to carry drinking water to the schoolhouse from a neighboring well forty or fifty rods distant. May Downing had been directed by her father not to carry water, on the alleged ground that the state of her health would not permit it. Two or three excerpts from the evidence will sufficiently indicate the general nature of the evidence on both sides.

1. CRIMINAL LAW: assault and battery: corporeal punishment: evidence.

May Downing testified as follows:

There was no suitable water on the school grounds. Scholars had been fetching it. At last recess in afternoon, Mr. Davis wanted me and Inez Johns to fetch a bucket of water. I told him I couldn't; that father said not to. He said he did not know what he told me to do that for, and I told him he said he'd tell him when he saw him. He took me by the arm and made me go up on the floor and take my geography, and said would either go to the well or take a whipping. I told him father told me not to. He led me up on the floor. Slapped me when he was back at the side. He said them that wouldn't pack water, and drink it, was hogs. . . . He

whipped me; was angry and vicious. I don't know how many licks he gave me, twenty or twenty-five. He was talking to me when he whipped, but I do not remember what he said. The stick was three feet long. Big as my second finger. Stick bigger at one end than the other. I don't know where he got the stick. He used it for a pointer. I wasn't in very good health at the time.

W. T. Downing, the father of May Downing, testified as follows:

. . . I told my daughter she was not to carry water if he asked her, and that I would tell him why some time. I told her on the day of the whipping. I examined her when she came home. She said her back smarted. I found she had several marks. I could not state how many they crossed, several of them. Two of them on her arm, and some across her shoulder. I couldn't hardly count the licks, and some of them were bloody water. They were from a big-sized straw to lead pencil. One end of the stripe bigger than the other. Red where they crossed, and would be kind of purple. The other end would be bloody water. They were just below the neck of her dress.

The defendant testified as follows:

When I dismissed school for the last recess afternoon October 24, 1910, I looked at the list which I had, and saw that May Downing and Inez Johns were the next two on the list of large scholars to carry water. I went part of the way back to them, and said: 'May and Inez, it is your turn to get water this day.' Inez said, 'Can we take the cup along?' I said, 'Yes.' May said: 'My father said for me not to carry water, and I am not going to.' I said: 'Oh, come now, get the water and be nice about it.' She said: 'I don't have to carry water.' I said: 'Don't sass me, or I will have to punish you.' She said: 'Well, I don't have to carry water.' I said: 'You get your book and come up here.' She said: 'Well, my father said for me not to carry water, and I ain't going to stand on the floor either.' I made no answer, but waited a few seconds for her to come, but she didn't, and I went back and took her by the arm

and led her to the front. On the way to the front she said: 'My father said for me not to carry water, and I ain't going to carry it, or I am not going to stand on the floor.' I said: 'All right, May; but don't sass me, or I will punish you.' She continued the same, sassy and resistful. She said as she did before, and I said, 'Stop that back talk.' She didn't stop. I used switch. . . . Did you administer the punishment because she refused to carry water? No, sir. I punished her to stop the disrespectful talking and the sass. We were in the front near the blackboard. I think I struck her in the neighborhood of twelve times, not more than that. I never struck hard. I think she was thinly dressed. Struck her across the shoulders. She did not cry. She continued to talk while I was striking her. Inez Johns was in the room. May talked to me in a disrespectful manner. I told her to stop that sass. I did not require her to carry the water after what she said. She spoke to me in a quick, angry manner. . . .

Giving full credence to the evidence of the state, as we must do for the purpose of the defendant's motion, it tended to show that the corporal punishment was immoderate in degree, and that it was inflicted for an unwarranted cause. The fact that the evidence on behalf of the defendant tended to show otherwise did not warrant the trial court to withdraw the case from the jury. The motion for directed verdict was therefore properly overruled. The same reason must govern us in refusing to interfere with the verdict, so far as the weight of evidence is concerned. It must be said that there is much in the record to corroborate the story of the defendant; but we could not, if we would, interpose our judgment against that of the jury on the weight of conflicting evidence.

II. The principal argument is directed to the proposition that certain two of the instructions of the court, Nos. 17 and 19, were conflicting, and that such conflict was necessarily prejudicial to the defendant. Except in one respect, no complaint is made as to the correctness of either instruction. It is argued, however, that because of the conflict one or the other is necessarily erroneous. The instructions are long, and we will not

2. SAME: conflicting instructions.

set them out. It is sufficient to say that instruction seventeen purports to deal with the supposed state of facts as contended for the state, and that instruction nineteen purports to deal with the supposed state of facts as contended for the defendant. In no other sense could it be said that they are contradictory. No complaint is made of the abstract correctness of No. 17 standing alone.

As to No. 19, however, it is contended that it erroneously submitted to the jury the question of what was a reasonable rule or regulation of the school, and whether it was a reason-

3. SAME: corporeal punishment: instructions.

able rule or regulation to forbid and punish "sassy" talk and impudent conduct on the part of the pupil. We think the instruction is not vulnerable to this particular objection. It did not require the jury to determine what was a reasonable rule, but it required the jury to determine what the conduct of the pupil was in fact, and whether it was of such a degree of impudence and defiance as to violate a reasonable rule of discipline in the school. There was no error at this point.

III. The defendant requested an instruction which was formally refused, although much of it was contained in an instruction given by the court. We think the instruction requested was in all material respects fairly embodied in such instruction given by the court.

IV. The defendant offered evidence that it had been a long-time custom of the school to have the larger children carry the drinking water from the same well to the school-

4. SAME: evidence of custom: instruction.

house. This evidence was refused as being immaterial. It was urged that such ruling was erroneous. It is argued that such evidence would tend to show the good faith of the defendant in requiring the water to be so carried on the particular day in question, and would warrant him also in believing that he had a right to require such service. The defendant is in no position to make such contention. His testimony was positive and unequivocal that he did not punish the pupil for refusing

to carry the water, but only for her impudent conduct in relation thereto. It is true that the trial court instructed the jury at this point that if the defendant, acting as a reasonable man, in good faith believed he had a right to require such service, and in such belief inflicted the corporal punishment because of the refusal of the pupil to perform the service, he would not be guilty of assault and battery. This instruction was more favorable to the defendant than his own evidence would warrant. If it were in a measure inconsistent with the theory adopted by the court in the earlier ruling rejecting the evidence of custom, it worked no prejudice to the defendant. The rejection of the evidence as immaterial was a proper ruling. It did not become otherwise by the later instruction of the court here referred to; the instruction itself being without prejudice. We are not without solicitude as to the correctness of the result in the trial court. If the jury attached undue weight to the testimony of the state, and failed to give proper consideration to the testimony of the defendant, not only has the defendant suffered wrong, but such wrong may result also in great demoralization in the discipline of the school. However, we are bound to be faithful to the actual record before us. The instructions of the trial court guarded the rights of the defendant with marked emphasis. He appears to have had a fair trial in the district court, and the result must be accepted as final.

The judgment of the district court is *Affirmed.*